ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| EDGAR J. VÁZQUEZ GONZÁLEZ<br><br>Apelante<br><br>v.<br><br>MCS HEALTH MANAGEMENT OPTIONS, INC.,<br>MCS ADVANTAGE, INC.,<br>MEDICAL CARD SYSTEM, INC.<br><br>Apelado | KLAN202500063 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.:<br>MZ2020CV00844<br><br>Sobre: Cobro de Dinero |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez

**Figueroa Cabán, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de marzo de 2025.

Comparece el doctor Edgar J. Vázquez González, en adelante el Dr. Vázquez o apelante, y solicita que revoquemos la *Sentencia* que emitió el Tribunal de Primera Instancia, Sala de Mayagüez, en adelante TPI, el 26 de diciembre de 2024.[1] Mediante dicho dictamen el tribunal primario declaró No Ha Lugar la demanda sobre sentencia declaratoria, incumplimiento de contrato, cobro de dinero, daños y perjuicios que presentó el Dr. Vázquez contra MCS Health Management Options, Inc., en adelante MCS Health; MCS Advantage, Inc., en adelante MCS Advantage y Medical Card System, Inc., en adelante MCS, en conjunto la apelada.[2]

Por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

---

[1] La *Sentencia* fue notificada, registrada y archivada en autos el 27 de diciembre de 2024.
[2] Apéndice del apelante, págs. 3-20.

**-I-**

La controversia que tenemos ante nuestra consideración se originó el 19 de septiembre de 2020, cuando el Dr. Vázquez presentó una *Demanda* en cobro de dinero contra MCS.[3] Alegó que la apelada incumplió con el contrato que suscribió y su enmienda posterior, al variar los términos relacionados a la compensación que recibe por los servicios médicos prestados.

Mediante *Contestación a Demanda*, MCS aseguró que no incumplió con los términos del contrato.[4] A su vez, adujo que la Ley Núm. 104-2002,[5] a la que se refiere el Dr. Vázquez en su reclamo, no aplica a MCS Advantage, ni a su relación con el apelante. En su opinión, la Oficina del Comisionado de Seguros de Puerto Rico, en adelante OCS, que administra la Ley Núm. 104-2002, *supra*, no tiene jurisdicción sobre MCS Advantage, Inc. En particular, sostuvo que la regulación federal de Medicare desplaza la legislación de Puerto Rico y ocupa el campo en cuanto a los planes Medicare Advantage.

Después de varios trámites procesales que son innecesarios pormenorizar para adjudicar la controversia ante nuestra consideración, el Dr. Vázquez presentó una *Solicitud de Sentencia Sumaria* […], en la que alegó que no existía controversia sobre hechos materiales que impidiese resolver el pleito de forma sumaria. Sostuvo, que las únicas controversias que debía dirimir el foro *a quo* eran de derecho, particularmente relacionadas con la interpretación del contrato y su enmienda. Específicamente, cuestionó si la enmienda al acuerdo

---

[3] *Id.*, págs. 1175-1191.
[4] *Id.*, págs. 1066-1089.
[5] Conocida como la Ley para el Pago Puntual de Reclamaciones a Proveedores de Servicios de Salud, según enmendada, 26 LPRA sec. 3001 *et seq.*

suscrito permitía a MCS secuestrar, de forma unilateral, el 2% por ciento del pago que recibía por los servicios prestados a los asegurados del programa de Medicare Advantage.[6]

Oportunamente, MCS se opuso a la petición del apelante y solicitó que se denegara la moción de sentencia sumaria del Dr. Vázquez; que se decretara sentencia sumaria a su favor sobre la totalidad de las causas de acción; y, en consecuencia, que se desestimara la *Demanda* en su contra.[7] Afirmó, que los reclamos del apelante carecen de mérito, ya que MCS actuó en todo momento de conformidad con las disposiciones del contrato en controversia.

Mediante *Réplica a Oposición a Solicitud de Sentencia Sumaria*, el Dr. Vázquez arguyó que MCS reconoció y no refutó los hechos que presentó como incontrovertidos.[8] Además, adujo que la apelada no acompañó con su oposición ni un ápice de evidencia que impugnara su petición sumaria, ni incluyó fundamento legal alguno que sustentara su oposición. A su entender, MCS se limitó a alegar, incorrectamente, que el Dr. Vázquez no cumplió con los requisitos de la Regla 36.3, *infra*. Además, afirma que la interpretación del contrato y su enmienda por MCS es improcedente. Por último, el Dr. Vázquez reiteró los argumentos que esbozó en su petición de sentencia sumaria y solicitó que se declarara no ha lugar el escrito de oposición de MCS y en cambio, que se dictara sentencia sumaria a su favor.

---

[6] Apéndice del apelante, págs. 371-1007.
[7] *Id.*, págs. 170-368.
[8] *Id.*, págs. 21-44.

Después de evaluar los escritos de las partes, el TPI determinó que los siguientes hechos no están en controversia:

1. El 16 de enero de 2004, el Dr. Vázquez firmó un contrato con Medical Card System, Inc., titulado *Preferred Provider Organization (PPO) Physician Agreement* (en adelante "Contrato de 2004").

2. El 28 de febrero de 2004, el Sr. Melvin Acosta firmó dicho contrato en representación de Medical Card System, Inc.

*3.* El contrato contiene una cláusula en la última página mediante la cual ambas partes están legalmente obligadas a cumplir con los términos y condiciones dispuestos en el mismo. *"Intending to be Legally Bound, the undersigned parties have executed this Agreement, intending to be bound hereby."*

4. La Sección 4.1 de Contrato de 2004 dispone:

   *Payment. MCS shall pay Provider in accordance with [the] compensation terms established by MCS from time to time and notified with at least thirty (30) days prior the effective date to the Provider by mail, via internet or any other form of electronic notification, and Provider agrees to accept such compensation as payment in full for all Covered Services rendered to Insureds. MCS shall make payments to Provider for the provision of Covered Services to Insureds within fifty (50) calendar days of MCS' receipt of a Clean Claim from Provider, or within a shorter period if required by applicable law. [Except for applicable Co-payments, Coinsurance or Deductibles, set forth in the applicable Insured plan contract, Provider shall seek compensation only from MCS for Covered Services provided to Insureds, and Provider will not seek payment from anyone other than MCS for Covered Services.]*

5. La Sección 9 del Contrato de 2004 dispone:

   *Amendments and Modification. No changes, amendments, or alterations to this Agreement shall be effective unless signed by both parties, except as expressly provided in sections 4.1 and 5.1 herein. Notwithstanding the foregoing, at MCS discretion, [MCS] may amend this Agreement upon written notice to Provider to comply with any applicable law or regulation, or any order or directive of any governmental agency.*

6. El 3 de junio de 2005, el Dr. Vázquez firmó una enmienda al contrato con Medical Card System, Inc. (en adelante "Enmienda de 2005")

7. El 3 de agosto de 2005, el Sr. Melvin Acosta firmó la Enmienda de 2005 en representación de MCS.

8. La Enmienda de 2005 contiene la cláusula uno (1) que gobierna los conflictos posibles entre el contrato y su enmienda. Ésta lee:

   *To the extent that there is conflict between the terms of this Agreement and any terms of the Agreement, the terms of this Amendment shall govern as they apply to MCS Life's Medicare Advantage program.*

9. La Enmienda de 2005 específicamente establece que es una enmienda y por ende no un contrato separado: *"THIS AMENDMENT amends the Provider Contract (the Agreement) by*

*and between Medical Card System, Inc. (MCS) and Édgar J. Vázquez (Provider) and is effective on the date set forth on the signature page."*

10. La Enmienda de 2005 establece que aplica a los servicios provistos bajo el programa de Medicare Advantage: *"Provider and MCS intend that the terms of the Agreement, as amended herein, as they relate to the provision of services under the Medicare Advantage program shall be interpreted in a manner consistent with applicable requirements under Medicare law."*

11. La página de la firma de la Enmienda de 2005 recalca la naturaleza de enmienda al contrato del documento al establecer: *"IN WITNESS WHEREOF, this Amendment to the Agreement between MCS and Provider is entered into by and between the undersigned parties on the latest date set forth below."*

12. El contrato de 2004 y la Enmienda de 2005, contienen las iniciales del Dr. Vázquez en todas las páginas indicando así que había leído la totalidad de ambos documentos y estaba de acuerdo con la totalidad de lo expuesto en ellos.

13. El Dr. Vázquez admitió la vigencia del contrato que se firmó el 16 de enero de 2004.

14. El Dr. Vázquez admitió que el Contrato de 2004 y la Enmienda de 2005 no indican que se le estará compensando por los servicios facturados bajo el tarifario de Medicare de Puerto Rico.

15. El Dr. Vázquez admitió que la sección 4.1 del Contrato de 2004, que rige las obligaciones de pago de MCS, no indica que se pagará de acuerdo con el tarifario de Medicare para Puerto Rico.

16. El Dr. Vázquez admitió que el Contrato de 2004 dispone que MCS podrá variar los términos de compensación con tal de que se notifiquen dichas [sic] variación treinta (30) días antes de la fecha de efectividad de esta.

17. El Dr. Vázquez admitió que la cláusula 4.1 del Contrato de 2004 no es ambigua.

18. El 9 de abril de 2013, MCS envió una comunicación al Dr. Vázquez, titulada Carta Informativa ADMRED 13-04-01, informado [sic] que estaría reduciendo en un 2% los pagos al Dr. Vázquez por los servicios ofrecidos a sus asegurados de Medicare Advantage a partir del 9 de mayo de 2013. MCS fundamentó su decisión en el hecho de que el Presidente Obama había emitido el 1 de marzo de 2013 una orden con recortes del secuestro fiscal que incluían una reducción de 2% del pago bajo el programa Medicare, tanto en el pago de Medicare tradicional a los proveedores, como en el pago de los planes Medicare Advantage a los proveedores.

19. El 1 de mayo de 2013, Centers for Medicare and Medicaid Services ("CMS") publicó un Memorándum relacionado con Medicare Advantage y el secuestro del 2%, el cual dispone en lo pertinente:

*Section 1854(a)(6)(B)(iii) of the Social Security Act prohibits CMS from interfering in the payment arrangements between MAOs and contract providers. The statute specifies that CMS "may not require any MA organization to...require a particular price structure for payment under such a contract..." Thus, whether and how sequestration might affect an MAO's payments to its contracted providers are governed by the terms of the contract between the MAO and the provider. We note that MAOs must follow the prompt pay provisions established in their contracts with providers and to pay providers under the terms of those contracts (see 42 CFR sections 422.520(b)(1) and (2)).*

*Similarly, the question of whether and how sequestration might affect a Part D plan sponsor's payment to its contracted providers is governed by the payment terms of the contract between the plan sponsor and its network pharmacy providers. We note that Part D plan sponsors must follow the prompt pay provisions established in their contracts with network pharmacy providers and to pay the providers under the terms of those contracts (see 42 CFR sections 423.520(b)(1) and (2)).*

20. El Dr. Vázquez reconoció en su deposición que la notificación de la variación de los términos de compensación contenida en la carta del 9 de abril de 2013 se hizo con treinta (30) días de antelación en conformidad con lo contratado entre las partes.

21. El *sequestration* de dos por ciento (2%) realizado por el Gobierno Federal aplicaba a partidas de Medicare Advantage.

22. La carta de CMS notificando el *sequestration* indicó que, el efecto en la compensación que tendría el *sequestration* entre proveedores de servicios, como el Dr. Vázquez, y las compañías de planes médicos, dependerá del contrato entre las partes.

23. El Dr. Vázquez en su demanda no hizo distinción alguna entre daños especiales y daños morales, ni realizó el ejercicio de particularizar sus daños.

24. En su cálculo de los daños reclamados, el Dr. Vázquez no hizo distinción alguna entre las diferentes causas de acción acumuladas en la demanda.

25. El Dr. Vázquez admitió en su deposición que al momento de radicar la demanda desconocía la cantidad que MCS le adeudaba.

26. A la fecha de su deposición el Dr. Vázquez tampoco conocía cuánto, el monto que le adeudaba MCS.

27. En su deposición el Dr. Vázquez admitió que con relación a los incisos A y D de su demanda desconocía cuanto era la cantidad de la deuda a su favor.

28. El Dr. Vázquez nunca notificó informe alguno con relación de la deuda a su favor, aun cuando había anunciado al Dr. José Alameda como perito económico.

29. El Dr. Vázquez es abogado licenciado, graduado de la Facultad de Derecho Eugenio María de Hostos y aceptado en las jurisdicciones estatales y federales de Puerto Rico. (Énfasis en el original).

En consideración a lo anterior, el TPI emitió una *Sentencia* en la que declaró *No Ha Lugar* la *Solicitud de Sentencia Sumaria* que presentó el apelante y *Ha Lugar* la *Oposición a Solicitud de Sentencia Sumaria* que sometió MCS. En consecuencia, decretó *No Ha Lugar* la *Demanda* y le concedió a la apelada costas y gastos, al amparo de la Regla 44.1 de Procedimiento Civil.[9]

---

[9] Regla 44.1 de Procedimiento Civil (32 LPRA Ap. V).

Inconforme, el Dr. Vázquez presentó un recurso de apelación en el que alega que el foro primario cometió los siguientes errores:

ERRÓ EL TPI AL INTERPRETAR LA CLÁUSULA DE LA ENMIENDA DE 2005 Y SU EXHIBIT A, AL CONCLUIR ERRÓNEAMENTE QUE LA CLÁUSULA DE COMPENSACIÓN DEL CONTRATO DE 2004, APLICABLE A SERVICIOS DEL PLAN COMERCIAL, NO ESTÁ EN CONFLICTO CON LA CLÁUSULA DE COMPENSACIÓN DE LA ENMIENDA DE 2005 PARA SERVICIOS DE MEDICARE ADVANTAGE. ESTA INTERPRETACIÓN ERRÓNEA CONDUJO A LA CONCLUSIÓN DE QUE MCS PODÍA UNILATERALMENTE VARIAR LOS TÉRMINOS DE COMPENSACIÓN CON UN PREVIO AVISO DE TREINTA (30) DÍAS, Y QUE EL CONTRATO NO IMPONÍA LA OBLIGACIÓN DE AJUSTAR LAS TARIFAS SEGÚN EL TARIFARIO DE MEDICARE, CONTRADICIENDO LA LETRA DEL CONTRATO Y LAS PRÁCTICAS COMERCIALES PREVIAS ENTRE LAS PARTES.

ERRÓ EL TPI AL NO DETERMINAR QUE LA ENMIENDA DE MCS AL CONTRATO EN EL 2016 Y EL SEQUESTRATION DE 2% IMPUESTO EN EL 2013 FUERON NULOS Y NO TUVIERON VALIDEZ.

ERRÓ EL TPI AL INCLUIR DETERMINACIONES DE HECHO QUE NO SE SOSTIENEN POR LA PRUEBA QUE SURGE DE LAS MOCIONES DISPOSITIVAS Y EN EL EXPEDIENTE DE CASO Y, A SU VEZ, DESCARTAR LA INCLUSIÓN DE HECHOS PERTINENTES, AVALADOS POR EVIDENCIA ADMISIBLE, QUE IMPACTAN LAS CONCLUSIONES DE DERECHO EMITIDAS MEDIANTE EL DICTAMEN APELADO.

Luego de examinar los escritos de las partes y los documentos que obran en autos, estamos en posición de resolver.

-II-

A.

La sentencia sumaria es un mecanismo procesal extraordinario y discrecional, que tiene el propósito de facilitar la solución justa y rápida de los litigios y casos civiles que no presenten controversias genuinas de hechos materiales y que, por lo tanto, no ameritan la celebración de una vista en su fondo.[10] Se trata de un mecanismo para aligerar la tramitación de un caso, cuando de los documentos que acompañan la solicitud surge que no existe disputa sobre algún hecho material y lo que procede es la aplicación del derecho.[11]

---

[10] *Aponte Valentín v. Pfizer Pharmaceuticals, LLC*, 208 DPR 263, 277-279 (2021); *Meléndez González, et als. v. M. Cuebas*, 193 DPR 100, 110-113 (2015); *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 594 (2013); *Ramos Pérez v. Univisión de PR*, 178 DPR 200, 213 (2010).
[11] *Aponte Valentín v. Pfizer Pharmaceuticals, LLC, supra; Meléndez González, et als. v. M. Cuebas, supra; Ramos Pérez v. Univisión de PR, supra*, pág. 214.

Conviene destacar que un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable".[12] En particular, el Tribunal Supremo de Puerto Rico, en adelante TSPR, ha declarado que las controversias sobre hechos irrelevantes o innecesarios son insuficientes para derrotar una moción de sentencia sumaria. De modo, que para lograr dicho objetivo la controversia sobre un hecho material tiene que ser real.[13] Es decir,

> … debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario. La fórmula, debe ser, por lo tanto, que la moción de sentencia sumaria adecuadamente presentada sólo puede negarse si la parte que se opone a ella presenta una oposición basada en hechos que puedan mover a un juez a resolver a su favor.[14]

Finalmente, en *Meléndez González, et als. v. M. Cuebas, supra,* el TSPR estableció el estándar específico que debe utilizar el Tribunal de Apelaciones para revisar una sentencia sumaria dictada por el Tribunal de Primera Instancia:

> **Primero**, reafirmamos lo que establecimos en *Vera v. Dr. Bravo*, supra, a saber: el Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar Solicitudes de Sentencia Sumaria. En ese sentido, está regido por la Regla 36 de Procedimiento Civil, *supra*, y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario. Obviamente, el foro apelativo intermedio estará limitado en el sentido de que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia y no puede adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo. La revisión del Tribunal de Apelaciones es una *de novo* y debe examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor.
>
> **Segundo***,* por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su Oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra*, y discutidos en *SLG Zapata-Rivera v. JF Montalvo*, supra.

---

[12] *Ramos Pérez v. Univisión*, *supra*, (citando a J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. JTS, 2000, T.I, pág. 609).
[13] *Id*. (Citas omitidas).
[14] *Id*., págs. 213-214, citando a P.E. Ortiz Álvarez, *Hacia el uso óptimo de la sentencia sumaria*, 3 (Núm. 2) Forum 3, 8 (1987).

> **Tercero**, en el caso de revisión de una Sentencia dictada sumariamente, el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, *el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos*. Esta determinación puede hacerse en la Sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.
>
> **Cuarto**, y por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[15]

### B.

Los contratos constituyen una de las fuentes de las obligaciones en el ordenamiento jurídico puertorriqueño.[16] Así pues, un contrato nace cuando una o varias personas prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio.[17] Este será válido si concurren tres elementos, a saber: consentimiento, objeto y causa.[18] De modo que, "[l]os contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez".[19]

Ahora bien, en el ámbito del derecho contractual rige el principio de libertad de contratación, según el cual los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, a la moral, ni al orden público.[20]

---

[15] *Meléndez González, et als. v. M. Cuebas*, *supra*, págs. 118-119. (Énfasis en el original).
[16] Art. 1042 del Código Civil de Puerto Rico, 31 LPRA sec. 2992 (ed. 1930). Debido a que el contrato en controversia se suscribió previo a la aprobación del Código Civil de 2020, el presente trámite apelativo está regulado, en lo pertinente, por la edición de 1930. Véase, Art. 1808 del Código Civil de 2020, 31 LPRA sec. 11713.
[17] Art. 1206 del Código Civil, 31 LPRA sec. 3371 (ed. 1930).
[18] Art. 1213 del Código Civil, 31 LPRA sec. 3391 (ed. 1930).
[19] Art. 1230 del Código Civil, 31 LPRA sec. 3451 (ed. 1930).
[20] Art. 1207 del Código Civil, 31 LPRA sec. 3372 (ed. 1930).

Finalmente, el principio de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las consecuencias derivadas de la buena fe.[21] En consecuencia, las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos.[22] En síntesis, los contratos se perfeccionan por el mero consentimiento y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley.[23]

### C.

La ley de Medicare y Medicaid se creó como parte de la Ley Federal del Seguro Social o *Social Security Act*.[24] Posteriormente, se modificó para incluir la Parte C, conocida como Medicare Advantage, en adelante MA.[25] Bajo este programa los beneficiarios obtienen más opciones de planes de salud y otros servicios que de ordinario no son provistos por el Medicare tradicional.[26]

Para su ejecución, la agencia federal *Centers for Medicare and Medicaid Services*, en adelante CMS, contrata con Medical Advantage Organizations, en adelante MAO, que son entidades privadas, que a su vez acuerdan con los proveedores de servicios de salud que atienden directamente a los beneficiarios de Medicare los términos y condiciones de la prestación de los servicios. Específicamente, los MAO negocian el pago con los

---

[21] *BPPR v. Sucn. Talavera*, 174 DPR 686, 693 (2008).
[22] Art. 1044 del Código Civil, 31 LPRA sec. 2994 (ed. 1930).
[23] Art. 1210 del Código Civil, 31 LPRA sec. 3375 (ed. 1930).
[24] *MCS Advantage, Inc. v. Fossas Blanco et al.*, 211 DPR 135, 159 (2003), Opinión Disidente, Jueza Presidenta Oronoz Rodríguez.
[25] *Id.; Medicare Prescription Drug, Improvement, and Modernization Act of 2003*, Ley Púb. Núm. 108-173 (117 Stat. 2066), 42 USC sec. 1395w *et seq.*
[26] *Id.*

proveedores de servicios de salud. Ahora bien, es una parte indispensable de este andamiaje jurídico que el sistema de pago implantado no se puede modificar.[27]

En lo aquí pertinente hay que destacar que la legislación federal de Medicare ocupa el campo en lo que respecta al pago a proveedores de servicios bajo el Programa de Medicare Advantage.[28]

Así lo ha reconocido el Tribunal Federal para el Distrito de Puerto Rico al resolver que la sección 19.150 del Código de Seguros de Puerto Rico, (Ley Núm. 90-2019), que prohibía a los MAO negociar con los proveedores tarifas menores a las aceptadas por CMS para Puerto Rico (*mandatory price provision*)[29] y terminar los contratos (*termination provision*),[30] carecía de eficacia jurídica en nuestra jurisdicción porque la legislación federal ocupa el campo.[31]

**-III-**

Para el Dr. Vázquez, la Enmienda de 2005, en adelante Enmienda, incluye una nueva forma de pago, distinta a la del Contrato de 2004, en adelante Contrato. Bajo esta, el precio se fija -no unilateralmente como en el Contrato- sino a base de un tarifario establecido; específicamente, el tarifario de Medicare para Puerto Rico. Por tal razón, bajo la enmienda de 2005 las tarifas las establece MCS cada año, conforme al parámetro previamente mencionado.

---

[27] 42 USC sec. 1395 24 (a) (6) (B) (iii).
[28] The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part. 42 USC sec. 1395w-26(b)(3).
[29] Subinciso 7 de la sección 19.150 del Código de Seguros de Puerto Rico, 26 LPRA sec.1915.
[30] Subinciso 8 de la sección 19.150 del Código de Seguros de Puerto Rico, 26 LPRA sec. 1915.
[31] *Medicaid & Medicare Advantage Prod. Ass'n of Puerto Rico, Inc. v. Emanuelli-Hernández*, Civ. No.:19-1940. Esta determinación fue confirmada por el Tribunal de Apelaciones para el Primer Circuito de Estados Unidos. 58 F 4th 5 (1st Circuit, 2023).

Arguye, además, que existe un conflicto entre las cláusulas de compensación del Contrato y la Enmienda. A su entender, esta ambigüedad debe resolverse contra la parte que redactó el contrato o lo que es lo mismo, contra la parte que provocó la ambigüedad, es decir, MCS.

Finalmente, para el apelante las enmiendas al Contrato de 2016 y el "sequestration" de 2% impuesto en 2013 son nulos porque nunca los consintió.

Contrario a la pretensión del Dr. Vázquez, para MCS no hay dos contratos. Solo hay un Contrato otorgado en 2004 y una Enmienda al mismo de 2005. Este único contrato establece claramente que MCS tiene la facultad de enmendar de tiempo en tiempo la manera de compensar a los proveedores de servicio. De modo, que el apelado no puede cuestionar la validez de dicha prerrogativa porque oportunamente prestó su consentimiento a la cláusula contractual en cuestión.

Luego de examinar *de novo* el expediente concluimos que la *Solicitud de Sentencia Sumaria* […] del apelante, incumple crasamente con los requisitos de la Regla 36.3 (a) de Procedimiento Civil, *supra*. Constituye, en esencia, un extenso alegato repleto de argumentos legales, interpretaciones de derecho y alegaciones acomodaticias.[32]

A esto hay que añadir, que la declaración jurada anejada adolece de los mismos defectos de la *Solicitud de Sentencia Sumaria* […],[33] a saber: contiene argumentos legales, interpretaciones jurídicas y alegaciones acomodaticias relacionadas con las causas de acción de la *Demanda*. Además, por el carácter técnico-contable de algunas de sus afirmaciones, dudamos que el declarante,

---

[32] Apéndice del apelante, págs. 371-394.
[33] *Id.*, págs. 395-397.

en este caso el Dr. Vázquez, esté cualificado para testificar en cuanto a su contenido.[34] Cónsono con los parámetros jurisprudenciales aplicables, la declaración jurada carece de valor probatorio.[35]

En cambio, la *Oposición a Solicitud de Sentencia Sumaria* presentada por MCS cumple sustancialmente con los requisitos de forma de la Regla 36.3 (a), *supra*.[36]

Concluido el análisis de forma de las peticiones de sentencia sumaria procede determinar si existen hechos en controversia.

Del análisis integrado de la *Solicitud de Sentencia Sumaria* […] y de la *Oposición a Solicitud de Sentencia Sumaria*, resolvemos que no existe controversia sobre ningún hecho esencial. Así pues, de conformidad con la normativa previamente expuesta, corresponde determinar si el tribunal aplicó correctamente el derecho. Y determinamos que sí lo hizo. Veamos.

Surge de los documentos que obran en autos, que el 16 de enero de 2004 las partes firmaron el Contrato intitulado *Preferred Provider Organizatiion (PPO) Physician Agreement*.[37] No hay controversia de que el Contrato suscrito está vigente.[38]

En su parte pertinente, la cláusula 4.1 del Contrato establece:

> MCS shall pay Provider in accordance with the compensation terms established by MCS from time to time and notified with at least thirty (30) days prior to the effective date to the Provider by mail, via internet or any other form of electronic notification, and Provider agrees to accept such compensation as payment in full for all Covered Services rendered to insureds.[39]

---

[34] Regla 36.5 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.5.
[35] *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 677 (2018).
[36] *Id.*, págs. 170-215.
[37] *Id.*, págs. 398-405.
[38] Así lo admitió el apelante en su deposición. Véase *Id.*, pág. 311, líneas 17 a 23.
[39] *Id.*, pág. 400.

Por otro lado, la Sección 9 del Contrato dispone:

> No changes, amendments, or alterations to this Agreement shall be effective unless signed by both parties, except as expressly provided in sections 4.1 and 5.1 herein. Notwithstanding the foregoing, at MCS' discretion, MCS may amend this Agreement upon written notice to Provider to comply with any applicable law or regulation, or any order or directive of any governmental agency.[40]

Posteriormente, las partes suscribieron la Enmienda intitulada *Amendment to the Specialist Provider Agreement to Comply with Medicare Advantage Requirements*, que dispone, entre otros asuntos, que "[t]o the extent there is a conflict between the terms of this Amendment and any terms of the Agreement, the terms of this Amendment shall govern as they apply to MCS Life's Medicare Advantage program".[41]

Una lectura integrada del Contrato y de la Enmienda revela que no existe contradicción alguna entre ambos. Por consiguiente, la cláusula 4.1 aplica en toda su extensión a la relación contractual entre las partes y, en lo aquí pertinente, permite concluir que la compensación por servicios facturados no se determina conforme al tarifario de Medicare tradicional. En otras palabras, la Sección 4.1 del Contrato no dispone que se pagará a los proveedores de servicio de acuerdo con el tarifario de Medicare para Puerto Rico.[42]

En resumen, ni el Contrato ni la Enmienda establecen que la compensación por servicios facturados se realizará conforme al tarifario de Medicare Puerto Rico.[43]

Aclarado lo anterior, de la letra del Contrato se desprende que MCS tiene la facultad de modificar los términos de la compensación por los servicios prestados,

---

[40] *Id.*, pág. 404.
[41] *Id.,* pág. 406.
[42] Esto lo admitió el Dr. Vázquez en su deposición. Véase *Id.*, pág. 296, líneas 1-12.
[43] Esto lo aceptó el apelante en su deposición. Véase *Id.*, pág. 294, líneas 18-25 y pág. 295, líneas 5-10.

siempre que ello sea notificado al proveedor con 30 días de anticipación.[44]

Por otro lado, surge del expediente que la modificación en los términos de la compensación, representada por el descuento del "sequestration" del 2%, se notificó antes del término de los 30 días de efectuada.[45] Consecuentemente, la conducta de MCS al implantar el descuento es consistente con el Contrato que regula la relación entre las partes.

En síntesis, como resolvió el foro apelado, la presente controversia a versa sobre la interpretación de los términos de compensación establecidos en el Contrato y su relación, si alguna, con la Enmienda. Todo esto conforme a nuestro ordenamiento jurídico civil. Conforme a lo anterior, la conducta de MCS ha sido consistente con las cláusulas 4.1, 9 del Contrato y con la Enmienda. Por consiguiente, el Dr. Vázquez no tiene derecho a que se le compense a base del tarifario de Medicare tradicional para Puerto Rico. Del mismo modo, MCS podía variar los términos de la compensación siempre y cuando notificara con 30 días de anticipación, lo que hizo.[46]

### -IV-

Por los fundamentos previamente expuestos se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[44] Esto lo admitió el Dr. Vázquez en su deposición. Véase, *Id*. pág. 276, líneas 1-15.
[45] Esto lo admitió el apelante en su deposición. Véase *Id*., pág. 279, líneas 1-25 y pág. 280, línea 1.
[46] Esto lo admitió el Dr. Vázquez en su deposición. Véase *Id*., pág. 276, líneas 1-15.